UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

IDAHO TRUST BANK,

                Plaintiff,

     v.

BANCINSURE, INC., an Oklahome
corporation; CONTINENTAL CASUALTY
COMPANY, an Illinois corporation,

             Defendants.

Case No. 1:12-cv-00032-REB

**MEMORANDUM DECISION AND
ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Currently pending before the Court are Cross-Motions for Summary Judgment (Dkts. 95, 98) filed by Plaintiff Idaho Trust Bank and Defendant BancInsure, Inc. on August 19, 2013.

## INTRODUCTION

Plaintiff Idaho Trust Bank ("Idaho Trust") alleges that Defendants Continental Casualty Company ("CNA") and BancInsure, Inc. ("BancInsure") were required, but failed, to fully indemnify and defend Idaho Trust from claims made against Idaho Trust by Inland Storage, Inc. ("Inland Storage") and James Hutchens ("Hutchens"). The case began in the Fourth Judicial District of the State of Idaho, in and for the County of Ada, on December 23, 2011 (Dkt 1-1). BancInsure removed the case to this federal court on January 24, 2012 (Dkt. 1).

**BACKGROUND**

1.      **The Underlying *Inland Storage* Litigation**

On August 3, 2009, Inland Storage filed a third-party complaint against Idaho Trust over

its refusal to extend financing that it had allegedly promised for Inland Storage's planned 2008

construction of an RV and boat storage facility in San Antonio, Texas (the "RV Facility").

Compl., Dkt. 1-1, ¶¶ 13-14.  The claims (Counts 1-4) included: (1) breach of contract, (2) breach

of implied covenant of good faith and fair dealing; (3) estoppel; and (4) detrimental reliance.[1]

Declaration of Ammon Hansen, Ex. J (Dkt. 101-9), ¶¶ 42-67.  On or about February 25, 2010,

Inland Storage and Idaho Trust settled their dispute (the "Settlement").  Included in the

Settlement were terms for future loans from Idaho Trust to Hutchens and Inland Storage that, if

completed, would result in the mutual release of claims between Idaho Trust and Inland Storage.[2]

Compl., ¶ 19.

A disagreement arose regarding the funding of a loan for Inland Storage to purchase the

steel for the proposed RV Facility.  *Id.*  As a result, Inland Storage filed a second amended third-

party complaint on July 27, 2010 to add claims, alleging a breach of the Settlement by failing to

extend the 2010 steel loan.  *Id.*  Specifically, two claims (Counts 5-6) were added, which were

breach of contract and breach of the implied covenant of good faith and fair dealing.[3]  Hansen

Decl., Ex. J, ¶¶ 68-78.

On November 2, 2010, the state court granted Idaho Trust summary judgment on Counts

---

[1]  Collectively, the "2008 Claim."

[2]  Under terms of the Settlement, Idaho Trust was required to extend a loan to Hutchens for the purchase of the steel.  Hansen Decl., Ex. J, ¶ 36.

[3]  Collectively, the "2010 Claim."

1-4 of the second amended third-party complaint. Each dismissed claim related to Idaho Trust's alleged breach of its commitment to finance the RV Facility in 2008. The court did not grant summary judgment on Inland Storage's claims that Idaho Trust breached the 2010 Settlement by failing to make the steel loan, finding there were genuine issues of material fact. *Id.* ¶ 20; Declaration of Carlton R. Burch, Ex. 7 (Dkt. 95-2), p. 8.

The case proceeded to a jury trial on Counts 5 and 6, from October 22, 2012 through November 1, 2012. Hansen Decl., Ex. U (Dkt. 101-19). The jury returned a verdict in favor of Idaho Trust, and the claims in Counts 5 and 6 were dismissed with prejudice. *Id.*, Exs. U, V (Dkts. 101-19, -20).

## 2. BancInsure's Policy

Idaho Trust had purchased an Extended Professional Liability Insurance Policy from BancInsure, with a policy period from August 30, 2008 through August 30, 2010 ("the BancInsure Policy" or "the Policy"). Hansen Decl., Exs. A, P (Dkts. 101-1, 103). The Policy was not renewed for the second year, and expired on August 30, 2009.[4] Among other coverages, the Policy provided coverage for "Company Lender Liability[,]" specifically:

> The Insurer will pay on behalf of the company, loss that is the result of a claim for a professional services wrongful act first made during the policy period or during the extended reporting period if exercised.

Ex. A, Sec. I.D. The Policy provides coverage for "lending wrongful acts." Ex. A, Sec. III.T. A "lending wrongful act" is defined as:

---

[4] Idaho Trust's policy with CNA became effective on this same date, August 30, 2009. Idaho Trust and CNA stipulated to CNA's dismissal from this lawsuit. *See* Order of Dismissal (Dkt. 86).

**MEMORANDUM DECISION AND ORDER - 3**

> any actual or alleged error, misstatement, misleading statement, act
> or omission, or negligent or breach of duty by the company
> concerning an extension of credit, an actual or alleged failure or
> refusal by the company to extend credit; or an actual or alleged
> agreement by the company to extend credit.  Lending wrongful act
> includes the servicing of loans for others under a contract or
> agreement.

*Id*.  Interrelated wrongful acts are covered as they are deemed to be have been made when the

earliest claim was first made.  *Id*., Sec. III.B.  "Interrelated wrongful acts" means "wrongful acts

that have as a common nexus any fact, circumstance, situation, event, transaction or series of

facts, circumstances, situations, events or transactions."  *Id*., Sec. III.Q.

The Policy also contains a significant exclusion, important to resolution of the issues

before the Court, which states that the insurer is *not* liable to make any payment for loss in

connection with any claim "based upon, arising out of, relating to, in consequence of, or in any

way involving:"

> any assumption by the company or an insured person of any
> liability or obligation under any contract or agreement, or the
> failure to perform any contract or agreement, unless such company
> or insured person would have been liable even in the absence of
> such contract or agreement[.]

*Id*., Sec. IV.A.13.

**3.      Tender of Defense to BancInsure**

On October 2, 2009, counsel for Idaho Trust sent a letter providing notice of the August

24, 2009 claim and tendered the claim to BancInsure pursuant to the Policy.  A copy of the

*Inland Storage* complaint was attached to the letter.  Hansen Decl., Exs. B & C (Dkts. 101-2, -3).

Demcy Wilson, a claim adjustor for BancInsure, responded to Idaho Trust,

acknowledging receipt of the notice of the claim and making a general reservation of rights and

**MEMORANDUM DECISION AND ORDER - 4**

defenses in the matter.  *Id.*, Ex. D (Dkt. 101-4).  Wilson also informed Idaho Trust that Kalchik,

Pratt & Associates ("KPA") would investigate the claim.  *Id.*

Ted Equals, Western Regional Manager for KPA, sent a letter to Idaho Trust's counsel

on October 6, 2009, confirming that his firm had been engaged by BancInsure to investigate the

facts surrounding the *Inland Storage* litigation.  *Id.*, Ex. E (Dkt. 101-5).

On December 28, 2009, Wilson, on behalf of BancInsure, sent counsel for Idaho Trust a

letter, stating the following:

> BancInsure, Inc. has previously approved and hereby confirms the
> approval of legal representation and the provision of the lawsuit
> defense on behalf of the Bank by Erik Stidman [sic] of Holland
> and Hart, subject to the Bank absorbing the initial $50,000 of
> defense expenses in light of the self-insured retention of $50,000.
> BancInsure will advance and make payment of indemnification of
> any and all reasonable defense expenses, which exceed $50,000,
> subject to the applicable limits of liability and other terms and
> provisions under the Extended Professional Liability Insurance
> Policy No. PLI0010678.

*Id.*, Ex. F (Dkt. 101-6).  In the letter, Wilson discussed the Policy's "Company Lender Liability"

insuring agreement and explained: "All claims involving interrelated wrongful acts shall be

considered a single claim and shall be deemed to have been first made when the earliest claim

was first made."  *Id.*, Ex. F at 4.  *See id.*, Ex. A., Sec. III.B.  The letter went on to discuss several

provisions and definitions from the Policy, and in the letter BancInsure agreed to make payment

of indemnification and "any and all reasonable defense expenses" to Idaho Trust for the *Inland

Storage* litigation.  *Id.*, Ex. F at 1 and 3-7.

**4.     BancInsure Terminates its Defense of Idaho Trust**

On November 11, 2010, following the state district court's order dismissing Counts 1-4

in the *Inland Storage* litigation, Mr. Equals wrote counsel for Idaho Trust to say that the Policy

did not cover damages related to Counts 5 and 6.  According to the letter, BancInsure's position

was that the Policy's contract exclusion at Section IV.A.13 applied to Counts 5 and 6.  Hansen

Decl., Ex. M (Dkt. 101-12).  BancInsure also reserved "any and all defenses" but did not

specifically name other exclusions.  *Id*.

On December 10, 2010, Idaho Trust requested reconsideration of the decision.  *Id*., Ex. N

(Dkt. 101-13).  BancInsure said no, through a reply letter from Equals on December 17, 2010,

stating: "[t]he remaining causes of action are related solely to the 2010 Settlement Agreement

and are breach of contract claims, as there was nothing pled in the nature of tort allegations to

implicate liability coverage."  *Id*., Ex. O (Dkt. 101-14).  BancInsure refused to continue its

defense of Idaho Trust in the *Inland Storage* litigation.

**5.     Idaho Trust Tenders Claim to CNA**

On October 21, 2010, Idaho Trust provided notice and tendered a claim to CNA related

to the *Inland Storage* second amended third-party complaint.  *Id*., Ex. Q (Dkt. 101-15).  CNA

first denied coverage on February 9, 2011 and later confirmed its denial on April 27, 2011.  *Id.*,

Exs. R, S, T (Dkts. 101-16, -17, -18).

**SUMMARY JUDGMENT STANDARD**

One principal purpose of summary judgment "is to isolate and dispose of factually

unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a

disfavored procedural shortcut," but is instead the "principal tool [ ] by which factually

insufficient claims or defenses [can] be isolated and prevented from going to trial with the

attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence, including all reasonable inferences which may be drawn therefrom, must be viewed in a light most favorable to the non-moving party and the Court must not make credibility findings. *See id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See id*. at 256-57. The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d

885, 889 (9th Cir. 2003).  An exception to this rule exists when cross-motions for summary judgment are filed.  In that case, the Court must independently search the record for issues of fact.  *See Fair Housing Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## DISCUSSION AND DECISION

### 1.    Overview

The Court is asked to decide, as a matter of law, whether the BancInsure Policy provided coverage for the 2010 Claim, *i.e.*, was it an "interrelated wrong act" that fell within the Policy period.  If the Court finds the claim was an interrelated wrongful act and was brought within the Policy period, then it must look at whether coverage is nonetheless excluded under the contractual liability exclusion.

As a district court exercising diversity jurisdiction, this Court must apply state law. Because the insurance policy was issued in Idaho, the Court must apply Idaho law.  *See, e.g., Industrial Indem. Ins. Co. v. U.S.*, 757 F.2d 982, 985 (9th Cir. 1995).

When interpreting insurance policies, general rules of contract law apply, along with certain special canons of construction for insurance contracts.  *Clark v. Prudential Prop. & Cas. Ins. Co.*, 66 P.3d 242, 244 (Idaho 2003).  "The general rule is that, because insurance contracts are adhesion contracts, typically not subject to negotiation between the parties, any ambiguity that exists in the contract 'must be construed most strongly against the insurer.'" *Farmers Ins. Co. of Idaho v. Talbot*, 987 P.2d 1043, 1046 (Idaho 1999) (quoting *Mut. of Enumclaw Ins. Co. v. Roberts*, 912 P.2d 119, 122 (Idaho 1996)).  Whether an insurance policy is ambiguous is a question of law.  *Id.*  An insurance policy is ambiguous when it is reasonably subject to differing

interpretations.

If the policy language is unambiguous, the policy is construed as written. "The court by construction cannot create a liability not assumed by the insurer nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability." *Armstrong v. Farmers Ins. Co. of Idaho*, 205 P.3d 1203, 1206 (Idaho 2009).

If an ambiguity is found, the language is construed most strongly against the insurer and in favor of the insured. *Id.* (citing *Arreguin v. Farmers Ins. Co.*, 180 P.3d 498, 500 (Idaho 2008)). The court is to construe insurance contracts "in a manner which will provide full coverage for the indicated risks rather than to narrow its protection." *Smith v. O/P Transp.*, 918 P.2d 281, 284 (Idaho 1996).

**2.      The 2010 Claim and 2008 Claim are Interrelated Wrongful Acts**

BancInsure contends that because the 2010 Claim was made outside the policy period,[5] which ended on August 30, 2009, there is no coverage under the Policy for the 2010 Claim. Idaho Trust concedes that the 2010 Claim was made after the policy period, but argues that it is a covered claim nonetheless because as an "interrelated wrongful act" it is considered a single claim[6] with the timely-made 2008 claim and therefore falls within the policy period. Under the Policy, interrelated wrongful acts are defined as those wrongful acts that have as a "common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances,

---

[5]  The 2010 Claim was first made in May 2010.

[6]  "All claims involving interrelated wrongful acts shall be considered a single claim and shall be deemed to have been first made when the earliest claim was first made."  Hansen Decl., Ex. A, Sec. III.C.

**MEMORANDUM DECISION AND ORDER - 9**

situations, events or transactions."  Hansen Decl., Ex. A., Sec. IV.Q.

In support of its position that the 2008 Claim and 2010 Claim are *not* interrelated, BancInsure relies heavily upon the deposition testimony of Idaho Trust's Rule 30(b)(6) designee, Thomas Prohaska.  BancInsure argues that Mr. Prohaska admitted in his deposition that the 2008 Claim and 2010 Claim were "independent" and "completely, logically not connected."  *See* BancInsure's Memorandum in Support of Motion for Summary Judgment (Dkt. 96), p. 16. BancInsure asserts that the answers of a Rule 30(b)(6) designee are "binding" and that a party cannot later proffer "new or different allegations."[7]  *See Rainey v. American Forest and Paper Ass'n, Inc.*, 26 F. Supp. 2d 82 (D.D.C. 1998) (finding that a party's attempt to later revise the positions taken by its corporate representatives to be inconsistent with Rule 30(b)(6)).

The Court has carefully reviewed the referenced testimony of Mr. Prohaska, but concludes that such testimony of Mr. Prohaska is not as definitive as argued by BancInsure.   For purposes of clarity and context, the Court will include the entirety of the referenced testimony. (The emphasis in such testimony has been placed by the Court.)

> Q [MR. JOST]: What did the bank understand that Mr. Hutchens
> was alleged in this complaint with respect – when he alleged that it
> failed to provide him a loan for the steel?
> What steel did you think he was referring to?
> MR. STIDHAM: So you're asking the last question?  What steel
> was Mr. Hutchens referring to?

---

[7]  In essence, BancInsure's assertion is tantamount to a judicial estoppel argument.  On the record and facts before the Court on the cross-motions for summary judgment, the elements of judicial estoppel would not be satisfied.  *See Ah Quin v. County of Kauai Dep't of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) (noting that judicial estoppel will apply where (1) a party's later position is "clearly inconsistent" with an earlier position, (2) the party succeeded in persuading a court to accept that earlier position so that a perception that the court was misled is created and (3) the party seeking to assert an inconsistent position would derive an unfair advantage on opposing party if not estopped).

MR. JOST: Yes.

MR. STIDHAM: Okay.

THE WITNESS [PROHASKA]: I believe what the complaint is – is making a reference to is steel that was – would have been the collateral in the steel loan. And I think that was generally referenced, although I'm not sure it was specifically referenced, in the steel agreement.

Q. (BY MR. JOST): Okay. So the bank's understanding was that the steel that was the collateral for the steel loan referenced in the settlement agreement --

A. Right.

Q. –which was the collateral for the steel was the steel itself, correct?

MR. STIDHAM: Object to form.

THE WITNESS: That was one of the elements of collateral; yes, Counsel.

Q. (BY MR. JOST): So the steel that Mr. Hutchens was referring to was the steel that as he described it in his factual allegations that he was attempting to procure for the RV storage facility, correct?

MR. STIDHAM: Object to form; vague as to time.

THE WITNESS: Counsel, I hesitate for a moment because your question goes a little bit to the heart of one of the matters that I think was in dispute in the underlying litigation.

Q. (BY MR. JOST): Okay. Stop right there.

My question isn't about anything before this – excuse, after this; the litigation, what you believe – what you believe is true or not true.

*All I'm asking is the bank's understanding of what Mr. Hutchens was referring to when he said "the steel."*

*A. I think he was referring to steel that he was attempting to acquire from Forge Building Supply.*

*Q. Okay. Thank you.*

*And the steel that he was attempting to obtain from Forge Building Company formed also the allegations or the basis for the allegations in the amended third party complaint related to breach of contract, correct?*

MR. STIDHAM: Objection to form.

MR. BURCH: Objection, vague.

MR. STIDHAM: Join that objection.

*THE WITNESS: I fundamentally disagree with that statement.*

Q. (BY MR. JOST) Okay. Between the filing of the amended complaint and the second amended third-party complaint, what other steel did Mr. Hutchens attempt to buy?

MR. STIDHAM: Object to form.

THE WITNESS: I don't know.

Q (BY MR. JOST): Is it your position that the second amended complaint is referring to steel that – and this loan and the $100,000 that was issued by the bank as a down payment on the steel from Forge is completely different than that that's alleged in the second amended third-party complaint?

MR. STIDHAM: Object as to form.

THE WITNESS: Counsel, I'm just –

Again, you – you kind of short – gave short shift to my position about the underlying litigation.

There was a question in the underlying litigation. Not the truth or non-truth. I understand that we've agreed that that's not a relevant issue, and I appreciate that.

But relative to exactly what the steel was, where the steel was, all of those things, that was an issue in the underlying litigation. And so my hesitancy relates to the fact that there was a period of time when that was a –an issue.

And frankly, I'm not necessarily convinced that was ever resolved in that litigation. So that's the nature of my hesitancy.

*Q. (BY MR. JOST): So let me just see if I can short circuit this. In the original amended third-party complaint --*

*A. Okay.*

*Q. – there's several factual allegations related to the Phase II, the boat and RV storage facility, the bank employee who promised the loan, the issuance of the $100,000 check --*

*A. Uh-huh.*

*Q. – to Forge for the down payment on the steel, and then there were allegations that the bank had orally offered to provide a loan for the steel, correct?*

*A. Uh-huh. Okay.*

*Q. And then the second amended third-party complaint comes along. All those allegations are now the same, as we've discussed, but now Mr. Hutchens is alleging that you agreed to provide a loan for the steel that he's described in his complaint in the settlement agreement and that the bank breached the settlement agreement by failing to provide that loan for the steel that he was going to purchase from Forge for the purposes of his storage facility in Texas, correct?*

MR. STIDHAM: Objection; move to strike narrative, compound, vague.

THE WITNESS: Against, I believe that inherent in a few of those – in that statement, there were some elements that I'm not sure I necessarily agree with.

I think I've tried to answer that, Counsel, by saying clearly,

the loan, which was described in paragraph 6 of the settlement agreement that we have reviewed extensively here today, was designed to acquire steel, and that loan was an independent loan for the purposes of acquiring that steel. It had nothing to do with the RV boat storage, and it was to acquire that steel.

So to the extent that's what you're asking me, I can agree with that, Counsel.

*Q (BY MR. JOST): Do you agree that based on the allegations in these two complaints, at least insofar as Mr. Hutchens is concerned, that he's alleging that the breach of settlement claims were logically connected to the original four claims for breach of the oral agreement to provide the steel, the steel loan?*

MR. STIDHAM: Objection to form; calls for speculation as to Mr. Hutchens' intent, vague and ambiguous. I think it's also outside the scope of this deposition, calls for a legal conclusion.

*THE WITNESS: Counsel, I do not agree that there is a logical connection, as you have described.*

Q. (BY MR. JOST): Okay. Is that because you believe that the steel he was trying to procure was different in the two – as described by him in the two complaints?

MR. STIDHAM: Objection to form, mischaracterizes facts.

THE WITNESS: That's not the basis for that conclusion.

Q. (BY MR. JOST): What's the basis for your conclusion?

A. Well, first, I think inherent in your question is a legal conclusion related to the interpretation and the – I guess the enforceability of a particular provision of your client's insurance policy. And I'm not going to comment on that because I believe that's the nature of this lawsuit and it ultimately a matter for the trier of fact.

*Having said that, I believe they are completely, logically not connected because it relates to a particular independent lending acts which we agreed to – to undertake according to the settlement agreement.*

Burch Decl., Ex 6, Deposition of Thomas Prohaska (Dkt. 95-2), 277:20-284:20.

BancInsure contends that this testimony constitutes an admission (or, at the very least, evidence beyond a genuine issue of material fact) to support its position that the 2008 Claim and 2010 Claim were not interrelated acts. The Court agrees that the testimony of Idaho Trust's Rule 30(b)(6) designee is clearly relevant to the issue, but on this record it is not dispositive. To

begin, Mr. Prohaska was asked in his deposition whether he agreed that "the breach of settlement claims were logically connected to the original four claims . . ." *Id.* at 283:10-11. Mr. Prohaska answered that he did not "agree there was a logical connection, as you [Mr. Jost] have described." *Id*. at 283:19-21. Mr. Prohaska then, shortly following, said: "I believe that they are completely, logically not connected because it[8] relates to a particular independent lending act which we agreed to – to undertake according to the settlement agreement." *Id*. at 284:15-20. Prior to Mr. Jost's question, Mr. Prohaska was discussing the subject matter of the loans, the initial loan being for the RV storage facility and the second loan being for steel, and stated: "the loan [described in the settlement agreement] was designed to acquire steel, and that loan was an independent loan for the purposes of acquiring that steel. It had nothing to do with the RV boat storage, and it was to acquire that steel." *Id*. at 282:22-283:4.

Immediately after this line of discussion, came the portion of the testimony cited by BancInsure: Mr. Prohaska was asked whether "the breach of settlement claims were logically connected to the original four claims for breach of the oral agreement to provide steel" and he responded: "I do not agree that there is a logical connection, as you have described." *Id*. at 283:10-21. An equally, if not more, reasonable inference of this testimony is that Mr. Prohaska is referring back to Mr. Jost's description of the subject matter of the two loans, which was that "the steel that [Hutchens] was attempting to obtain from Forge Building Company [in Counts 5-6] formed also . . . the basis for the allegations in the amended third-party complaint related to breach of contract [in Counts 1-4] . . ." *Id*. at 279:22-280:1. Accordingly, although Mr. Prohaska's testimony, as Idaho Trust's Rule 30(b)(6) designee, may lend *some* support for

---

[8] It is not clear what "it" refers to in this statement.

BancInsure's position, it does not compel that result.

In further support of its position that the 2008 Claim and 2010 Claim are *not* interrelated, BancInsure points to the summary judgment order in the underlying *Inland Storage* action which stated that the claims fall into "two categories . . .[f]irst, claims arising from the refusal of Idaho Trust to make a loan in 2008 for the construction of the RV facility . . . [and] [s]econd, claims arising from the alleged breach of the 2010 Settlement Agreement" (Burch Decl., Ex. 7, *Inland Storage* litigation Summary Judgment Order (Dkt. 95-2), pp. 5-7) as well as Idaho Trust's representation that there were "two categories of claims" in the underlying action (Burch Decl., Ex. 4, Idaho Trust Bank's Motion for Summary Judgment in *Inland Storage* litigation (Dkt. 96-2), p. 1). None of these circumstances, however, are drawn upon the exact template before this Court – that is, the task of considering the entirety of the record, including all the facts and all of the legal argument, to determine the particular meaning of a term defined in the Policy itself. Hence, the questioning of Mr. Prohaska may offer some piece to be used in solving that puzzle, and the state court's decision upon a differing aspect of the circular dispute between Idaho Trust and its insurers may be useful, but neither is dispositive upon this Court's decision as to the interpretation of the insurance policy and whether the 2008 and 2010 claims shared a "common nexus" of "any fact, circumstance, situation, event, transaction." A description of the claims, even if the description places them into "two categories," does not dictate whether the claims did or did not share a common nexus under the terms of the Policy. Nor, for that matter, are the concepts mutually exclusive in the context of the dispute here –*e.g.*, it is possible for separate claims to be just that – separate – but still be interrelated, in that there may be factual connections between the claims that interrelate one to the other, much like separate branches of a

family tree.

Indeed, other courts have given an expansive reading to the very same definition of "interrelated wrongful acts" as used in the BancInsure policy. In *WFS Financial, Inc. v. Progressive Casualty Ins. Co., Inc.*, the court held that two separate class action lawsuits which had as a common basis the defendant's alleged wrongful business practice were "interrelated" as the harms alleged were "causally related and do not present such an 'attenuated or unusual' relationship that a reasonable insured would not have expected the claim to be treated as a single claim under the policy." 232 Fed. Appx. 624, 625 (9th Cir. 2007). *See also Highwoods Props. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 924-25 (8th Cir. 2005) (although lawsuits alleged different legal theories, they were related because they both alleged that the insured provided misleading information to shareholders to obtain favorable votes for a merger); *Capital Growth Financial LLC v. Quanta Specialty Lines Inc. Co.*, 2008 WL 2949492, *4-5 (S.D. Fla. July 30, 2008) (although claims involved different investors, additional or different investments and some unique allegations regarding specific misrepresentations, the court concluded they were related because they all alleged that the insureds engaged in a pattern of unsuitable and risky investments).

Here, the 2008 Claim and 2010 Claim involve the same parties, the same lending relationship between the parties, and the same underlying subject matter (the steel for Hutchens' proposed RV Facility). The definition of "interrelated wrongful acts" describes a broad range of relationships that is decidedly satisfied here. The 2008 Claim and 2010 Claim share as a common nexus, facts, circumstances and events. The 2010 Claim would not exist but for the attempts to settle the 2008 Claim. On that fully-faceted record, the Court has little difficulty

concluding that the 2010 Claim is "interrelated" to the 2008 Claim, as defined in BancInsure's Policy.  For purposes of the cross-motions for summary judgment, the Court finds that reasonable minds could not differ as to the conclusion that these two claims were interrelated and accordingly the 2010 Claim falls within BancInsure's policy period.

**2.       The Contractual Liability Exclusion Does Not Exclude Coverage for the 2010 Claim**

Having found that the BancInsure Policy provides coverage for the 2010 Claim, the next question is whether coverage is excluded under the Policy.  BancInsure contends that the contractual liability exclusion found at Section IV.A.13 of the Policy excludes coverage for the 2010 Claim.  This exclusion bars coverage for loss "in connection with any claim based upon, arising out of, relating to, in consequence of, or in any way involving . . . any assumption, or the failure to perform any contract or agreement, unless such company or insured person would have been liable even in the absence of such contract or agreement."  Hansen Decl., Ex. A (Dkt. 101-1), Sec. IV.A.13.

Importantly, a provision excluding coverage is strictly construed in favor of the insured and the insurer has the burden to use clear and precise language if restricting the scope of what its policy otherwise purports to cover.  *Moss v. Mid-America Fire & Marine Ins. Co.*, 647 P.2d 754, 756 (Idaho 1982).  Courts shall not allow policy limitations and exclusions to defeat the precise purpose for which the insurance is purchased.  *Bonner County v. Panhandle Rodeo Ass'n, Inc.*, 620 P.2d 1102, 1106 (Idaho 1980).

BancInsure asserts that the 2010 Claim involved a claim for breach of contract (specifically, breach of the settlement agreement) and for breach of the covenant of good faith

and fair dealing, which sounds in contract, not tort,[9] thus it is barred by the Section IV.A.13

exclusion of claims for "the failure to perform any contract or agreement." Further, BancInsure

characterizes the 2008 Claim (Counts 1-4) as premised upon a "lending wrongful act" and, thus,

based on "independent tort liability" whereas the 2010 Claim (Counts 5-6) was not based on

independent tort liability. BancInsure Mem. (Dkt. 96), p. 16.

Idaho Trust counters that the purpose of the BancInsure Policy is to cover "lending

wrongful acts" which, by its very definition, includes lending acts that arise from contracts.

Idaho Trust contends that BancInsure's argument, if accepted, would serve to eliminate promised

coverage. Idaho Trust asserts that the 2010 Claim (Counts 5 and 6), just as the 2008 Claim,

arose from a lending wrongful act, specifically Hutchens' allegations that Idaho Trust was to

provide him with a loan to purchase construction steel but wrongfully added material terms to

the deal. *See* Hansen Decl., Ex. J, ¶¶ 36, 38, 40. The sum of the argument, in the Court's view,

is that even though the post-settlement lending relationship was a product of the settlement of the

2008 Claim, it was the bank's conduct in documenting the terms of the loan that unraveled the

deal, and therefore – according to Idaho Trust – Hutchens was inescapably claiming that there

had been a wrongful lending act.

BancInsure relies heavily on an Idaho case involving an insurance policy that provided

general liability coverage for property damages or bodily injured caused by "an occurrence," but

then excluded coverage for damages "by reason of the assumption of liability in a contract or

agreement." *Employers Mutual Cas. Co. v. Donnelly,* 300 P.3d 31, 36 (Idaho 2013). The

---

[9] The covenant of good faith and fair dealing is a covenant in contract, not in tort. A claim for a breach of that covenant, therefore, sounds in contract and not in tort. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 863 (Idaho 1991).

underlying action in *Employers Mutual* arose out of a construction contract in which property owners sued a construction company for negligent and intentionally faulty workmanship, breach of contract, and breach of warranties and alleged damages to property, physical injury, and loss of use. *Id*. at 32. The construction company's insurer filed a declaratory action to establish it had no liability. *Id*. at 33. At the trial in the underlying action, the jury awarded damages solely on a claim for breach of the implied warranty of workmanship. *Id*. at 36-37. The claim for breach of implied warranty of workmanship was derived, however, from a dispute over the defendant's performance under a contract. On those facts, in the declaratory action, the Idaho Supreme Court concluded that there was no duty beyond the contractual promise and the contractual liability exclusion precluded coverage under the policy. *Id*. at 37. BancInsure argues its policy contains a similar express exclusion for contractual damages that bars coverage for the 2010 Claim.

The facts of *Employers Mutual* are dissimilar to this case. The pertinent insurance policies are different by their very nature – in this case, the BancInsure Policy is an errors and omissions policy. The policy in *Employers Mutual* was a comprehensive general liability policy. The different policies covered different types of risks. Further, the *Employers Mutual* policy covered bodily injury or property damage that is caused by an "occurrence" and a claim for property damage. *Id*. at 36. The BancInsure Policy, on the other hand, covers loss for "lending wrongful  acts," which by its very definition includes "an actual or alleged agreement by the company to extend credit." *See* Hansen Decl., Ex. A, Sec. III.T. The fact that the court in *Employers Mutual* found the contractual liability exclusion to be applicable and enforceable does not convince this Court that the contractual liability exclusion in the BancInsure Policy is

likewise applicable and enforceable.  The Idaho Supreme Court's analysis turned explicitly on whether the implied warranty of workmanship (the claim at issue) derived from a contract in that case.  Hence, it is too simplistic to say, as BancInsure posits, "that contract exclusions preclude indemnity coverage for breach of contract claims."  While the *Employers Mutual* case may have provided an opportunity for a direct application of the contractual liability exclusion, the facts of this case do not lend itself to such an application, as discussed further below.

Other of the cases cited are distinguishable either in terms of what the policies cover or the language of the contractual liability exclusion.  BancInsure focuses on the interpretation of the "arising out of" language used in the exclusion.  Courts typically use either a "but for" test or an "incidental relationship" test when interpreting such language in this type of exclusion.  *See Looney Ricks Kiss Architects, Inc. v. State Farm Fire & Cas. Co.*, 677 F.3d 250, 256 (5th Cir. 2012).  BancInsure contends that under either test, the 2010 Claim is excluded because it "arose out of" Idaho Trust's contractual liability for breach of the 2010 Settlement Agreement and there was no independent basis for liability.  BancInsure Mem. (Dkt. 96), p. 19.  The Court is not persuaded by this line of thinking.  The BancInsure Policy is unique from the policies at issue in the cases cited by BancInsure in that it expressly states it covers "lending wrongful acts" which include "an actual or alleged *agreement* by the company to extend credit" but then excludes coverage for "any liability or obligation under a contract."  Hansen Decl., Ex. A Sec. III.T (emphasis added), Sec. IV.A.13.   The cases cited by BancInsure do not address such a situation.  *See MarineMax, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 2013 WL 425832 (M.D. Fla. Feb. 4, 2013) (policy defined a covered wrongful act as any "actual or alleged negligent act, error or omission, misstatement or misleading statement . . ." and excluded claims "arising out of

liability you assume under any contract or agreement."); *Cousins Submarines, Inc. v. Fed. Ins. Co.*, 2013 WL 494163 (E.D. Wis. Feb. 8, 2013) (definition of "wrongful act" covered by policy is not provided in the court's opinion); *Fed. Ins. Co. v. KDW Restructuring & Liquidation Servs., LLC*, 889 F. Supp. 2d 694 (M.D. Pa. 2012) (same); *BancInsure, Inc. v. First Interstate Bank*, 2013 WL 5933652 (D. Mont. Sept. 23, 2013) (same).[10]

While these cases might be persuasive in another context, they are not sensibly applied to the current situation and Policy before the Court. Hutchens and Inland Storage's second amended third-party complaint alleged, among other things, that: "Under the Settlement Agreement, Idaho Trust was required to extend a loan to Third Party Plaintiffs [Hutchens and Inland Storage] for the purchase of the steel" and that "Idaho Trust added several additional material terms to the Steel Loan" thereby breaching the Settlement Agreement. Hansen Decl., Ex. J, ¶¶ 36, 38, 41. Hutchens' allegations with respect to the 2010 Claim , although identified as "breach of contract" and "breach of the implied covenant of good faith and fair dealing,"[11] stem from his allegation that Idaho Trust promised to extend a loan and subsequently failed to do so. This falls squarely within the definition of a "lending wrongful act."

To the extent that BancInsure contends the contractual liability exclusion would exclude

_____

[10]  *Cf. Cincinnati Ins. Co. v. Stonebridge Financial Corp.*, 797 F. Supp. 2d 534 (E.D. Pa. 2011) (vacated by 2011 WL 10977963 (E.D. Pa. Nov. 17, 2011)). This case cited by Idaho Trust, while vacated and not binding, did address the issue posed by Idaho Trust, which is if a bank's lending relationship is almost always contractual in nature, what is the significance of an endorsement that covers "wrongful lending acts" but later excludes claims based on or arising out of any oral or written agreement. The court in the vacated decision found the contract exclusion did not apply.

[11]  Similarly, the 2008 Claim, for which BancInsure provided coverage, included claims for breach of contract and breach of the implied covenant of good faith and fair dealing, as well as detrimental reliance and estoppel. Hansen Decl., Ex. J, ¶¶ 42-67.

these types of claims, the Court rules that such an exclusion would not be enforceable as it would

eliminate coverage for something otherwise clearly covered under the Policy. An insurer cannot

seek to apply policy limitations and exclusions in a way to defeat the precise purpose for which

the insurance is purchased. *See Martinez v. Idaho Counties Reciprocal Mgmt. Program*, 999

P.2d 902, 907 (Idaho 2000). While the Court does not find the contractual liability exclusion to

render the Policy completely illusory,[12] the Court will not enforce it against Idaho Trust on the

particular facts in this case. Again, the Court emphasizes that an insurer cannot in one section

provide coverage for acts that include "an actual or alleged agreement" and then, in another

section, attempt to exclude coverage for claims "based upon [or] arising out of" "the failure to

perform any contract or agreement[.]" These two sections cannot be reconciled and therefore the

Court construes the exclusion against the insured, BancInsure, and finds that there is coverage

for the 2010 Claim under the Policy.[13] *See Smith v. O/P Transp.*, 918 P.2d 281, 284 (Idaho

1996) (insurance contracts are to be construed "in a manner which will provide full coverage for

---

[12] An illusory policy is defined as one where if "it appears that any actual coverage does exist it is extremely minimal and affords no realistic protection to any group or class of injured persons." *Martinez*, 999 P.2d at 907. The Court does not go so far as to hold that the BancInsure Policy is entirely illusory, as there are circumstances in which the contractual liability exclusion could be enforced and not frustrate the purpose of the Policy. For example, if a lawsuit was brought against Idaho Trust to collect rent owed to its landlord, the claim would be barred by the exclusion because it was the "failure [of Idaho Trust] to perform any contract or agreement" [to pay rent] that it would not be liable for "in absence of such contract or agreement."

[13] In its motion for summary judgment, Idaho Trust mentions the "other insurance" exclusion found in the BancInsure Policy (Hansen Decl., Ex. A (Dkt. 101-1), Sec. IV.A.9)) and raised in its Answer (Dkt. 82). BancInsure responds that Idaho Trust fails to prove the inapplicability of this exclusion. As BancInsure has not moved for summary judgment pursuant to this exclusion, and the burden is on the insurer to prove the applicability of an asserted exclusion, the Court will not address this exclusion.

the indicated risks rather than to narrow its protection"); *Arreguin v. Farmers Ins. Co. of Idaho*, 180 P.3d 498, 501 (Idaho 2008) (coverage exclusions are strictly construed in favor of the insured).

## CONCLUSION

Under the terms of the BancInsure Policy, the Court finds that the 2010 Claim and 2008 Claim are "interrelated wrongful acts" so that they are deemed to be a single claim and first made when the earlier claim was made, making the 2010 Claim fall within the Policy period. Further, the Court will not enforce the contractual liability exclusion relied upon by BancInsure against Idaho Trust as the Court finds that it frustrates the purpose for which the insurance was purchased and should be strictly construed in favor of Idaho Trust, as the insured. Accordingly, summary judgment will be entered in favor of Idaho Trust.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1)      Defendant BancInsure, Inc.'s Motion for Summary Judgment (Dkt. 95) is DENIED; and

2)      Plaintiff Idaho Trust Bank's Motion for Summary Judgment (Dkt. 98) is GRANTED.

DATED:  **March 20, 2014**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge